```
1                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NORTH CAROLINA
2


3


4    - - - - - - - - - - - - - -


5    UNITED STATES OF AMERICA


6    v.                              Docket No. 5:09-CR-216-FL


7    DANIEL PATRICK BOYD             New Bern, North Carolina
                                     August 24, 2012
8    - - - - - - - - - - - - - -


9
```

**TRANSCRIPT OF SENTENCING HEARING BEFORE**
**THE HONORABLE LOUISE W. FLANAGAN, DISTRICT JUDGE,**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

```
14   APPEARANCES:

15   For the Government:  John Bowler, Esq.
                          Assistant United States Attorney
16                        Office of the United States Attorney
                          310 New Bern Avenue
17                        Suite 800
                          Raleigh, NC 27601
18
                          Jason M. Kellhofer, Esq.
19                        United States Department of Justice
                          950 Pennsylvania Ave., N.W.
20                        Room 2740
                          Washington, DC 20530
21

22

23

24
          Recorded stenographically by machine shorthand.
25      Transcript produced by computer-assisted technology.
```

```
1    (Appearances, Continued)

2    For the Defendant:    Rosemary Godwin, Esq.
                           Deborah Graves, Esq.
3                          Assistant Federal Public Defenders
                           Office of the Federal Public Defender
4                          150 Fayetteville Street, Suite 450
                           Raleigh, NC 27601
5
     U.S. Court Reporter:  Harold M. Hagopian, RDR, CRR
6                          209 Drake Landing
                           New Bern, NC 28560
7                          Tel. (252) 474-6677
                           hhagopian@aol.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1
2          (The following proceedings were held at the United
3    States Courthouse, 413 Middle Street, New Bern, North
4    Carolina, before the Honorable Louise W. Flanagan,
5    District Judge, for the Eastern District of North
6    Carolina, on August 24, 2012, at 3:46 p.m.)
7          (Attorneys Bowler and Kellhofer are present for the
8    government.  Attorneys Godwin and Graves are present for
9    the defendant.  The defendant is present.)
10                        *      *      *
11          THE COURT:  All right, let the record reflect
12   Mr. Boyd's here and present with counsel.  The
13   government's represented, as well.
14         Who will be speaking primarily for Mr. Boyd?
15   Ms. Godwin?
16          MS. GODWIN:  Yes, your Honor.
17          THE COURT:  Okay.  Have you had enough time to
18   review the presentence report and talk with Mr. Boyd to be
19   ready today?
20          MS. GODWIN:  I have, your Honor.
21          THE COURT:  I've read the -- the psychological
22   reports that were contributed.  I believe I saw Dr. Corvin
23   out there.  Are you anticipating calling any witnesses?
24          MS. GODWIN:  Your Honor, Dr. Corvin and
25   Dr. Hilkey are here, and they are available to the Court

```
 1    in the event that the Court had any questions for them,

 2    particularly about Mr. Boyd's mental and emotional health.

 3              THE COURT:  Well, I have read the memorandum,

 4    I've read the doctors' reports, but I certainly don't want

 5    to, while we're starting later than you might have

 6    thought, preclude you from departing from your manner of

 7    presentation.

 8        If you -- if you didn't plan on calling them, I

 9    don't think it will be necessary for me to ask them

10    questions based on my understanding of their writings.  I

11    feel pretty confident I understand their positions.

12        But if you want to call them and develop anything

13    else, I'm not going to tell you you can't.

14              MS. GODWIN:  I understand, your Honor, and we

15    did not anticipate calling --

16              THE COURT:  Okay.

17              MS. GODWIN:  -- them, unless the Court had

18    questions.

19              THE COURT:  Okay.

20        Mr. Boyd, I read your letter that just came in, and

21    I read other letters, as well, including from Dylan and

22    neighbors and other family members.  So, I have benefit of

23    this information.

24        But I turn your attention and mine to the

25    presentence report.  There are no objections, per se.
```

1  Have you had enough time to review this report and talk
2  with your lawyers to be ready for sentencing?
3              THE DEFENDANT:  Yes, ma'am.
4              THE COURT:  All right.
5        Bnow, with respect to the government's motion, is
6  that going to be requested to be heard under seal in the
7  confidence of a closed courtroom, or not?
8              MR. BOWLER:  No.  There is one small matter at
9  some point we'd like to just very briefly approach the
10 bench with, your Honor.
11             THE COURT:  Okay.
12             MR. BOWLER:  But the 5K, itself, we don't think
13 so.
14             THE COURT:  All right.  With the court reporter
15 coming to the side, I'll invite counsel forward.
16                       *    *    *
17     (Sealed sidebar proceedings appear under separate
18 cover.)
19                       *    *    *
20             THE COURT:  I have familiarity with the offense
21 conduct at issue, having presided now over two trials for
22 approximately a total of ten weeks, all together.  And I
23 have in your case considered especially what the Probation
24 Office has presented here and reflected on the trials, and
25 also on your trial testimony that's been received now

1   twice.

2       I'm familiar with your family background, your

3   health, your education, substance-abuse issues, your prior

4   contacts with the criminal justice system.

5       You find yourself, at the start, in that favorable

6   category of a I.  By application of the terrorism

7   enhancement, though, you move very immediately to the

8   criminal history category of a VI.

9       I've reviewed all of this information and note for

10  the record the Court receives the following advice from

11  the sentencing guidelines.  And the guidelines are

12  advisory.  They're not mandatory.  The Court is required

13  to consider their advice, but then moves towards the

14  factors set forth in 18 United States Code, Section 3553,

15  with benefit of the advice of the guidelines, which, in

16  this case, is a term of imprisonment of life, and

17  considers the need for the sentence to promote respect for

18  the law, to discourage this type of conduct, to protect

19  the public, and to provide any needed treatment or care

20  when reflecting on the overarching nature of the offenses

21  at issue and the history that a defendant brings into the

22  courtroom.

23      Count 1 carries with it a maximum term of

24  imprisonment of 15 months.  The advice of the guidelines

25  is capped by that, 180 months -- 15 years, 180 months.

1    Count 2 carries with it a maximum term of
2  imprisonment of life, and, as noted, the advice of the
3  guidelines is a life sentence.

4    You're not eligible for probation.  Your behavior
5  can be supervised for up to five years on Count 2 and
6  three years on Count 1.

7    The fine could be as much as a quarter-of-a-million
8  dollars.  The guidelines suggest a range of between 25,000
9  to 250,000.  And there's a $200 special assessment.

10    You are charged with many other crimes:  You are
11  charged with conspiracy to commit murder on Quantico in
12  northern Virginia; you are charged with firearms
13  violations.

14    The government has agreed today to dismiss all of
15  these remaining counts, Counts 3 through 11, at
16  sentencing.  And both parties agree that a downward
17  adjustment for acceptance of responsibility is
18  appropriate.

19    The offense level stands at a 43.

20    Now, what else would you have me take up and
21  consider?  I believe you have a motion?

22        MS. GODWIN:  Yes, your Honor.  We had, I think,
23  explained how Mr. Boyd found himself in this courtroom as
24  thoroughly as we could in the sentencing memorandum.

25    I do think that he has a very unique family history.

1   He's got a very unique personality and mental health

2   structure that did leave him particularly vulnerable to

3   being seduced by the extremism.

4        He started out in life with a very chaotic,

5   unpleasant childhood.  And his first experience with Islam

6   was through a step-father, and then, later, it was an

7   opportunity for him, as we expressed in the memo, I think,

8   to try to make peace with both his Muslim step-father and

9   his patriotic military father.

10       It's difficult to talk about Mr. Boyd without a

11  great deal of emotion because the experience that

12  Ms. Graves and I have had with Mr. Boyd is undoubtedly the

13  most intimate attorney-client privilege experience I've

14  had.

15       I can tell you that when we first met Mr. Boyd, he

16  was very much the Mr. Boyd that we had heard on the

17  audio.  And Ms. Graves and I found that gentleman to be

18  particularly challenging to help.  And he told us one day

19  when we came, please don't dread me.  And he knew we did,

20  I think, dread the challenging interchanges we had.

21       Over the course of three years, we have argued with

22  Mr. Boyd; we have debated with Mr. Boyd; we have shared

23  and explored the spirituality of life and different

24  religions; we have, at times, laughed with Mr. Boyd.

25       But we have also grieved with Mr. Boyd.  We have

tapped into what I believe is the true Daniel Boyd, the
one that never had a chance, that was fighting to have a
chance, that was trying to find himself when he left home
and met Sabrina.  The Daniel Boyd that was so desperate
for approval from the patriarchs in his family; that got
swept up in the romanticism of Abdullah Azzam; that went
on his great adventure as a young man seeking heroism on
the battlefield, to be seen with honor in his parents'
eyes; that got to a strange land that he describes as
recently as yesterday, in talking with some members of the
government, as a very romantic, exciting experience --
going into Pakistan and describing the smells and the
change in the environment and the culture and the nature
of the people.  And, looking back, recognizing --
recognizing the seeds of a strange theology that was being
planted within him that has caused him so much conflict
over the course of his life.

     There was a core Daniel Boyd that was very
uncomfortable with the pressure from the theology, and he
found his way back to the United States and left the
pressure of that theology in the style that he had
adopted, that most problems in his life were to run.

     He and his wife left the Boston area because of the
pressures from the Islamic community on the great
Saifullah; you know, the white American freedom-fighter

1    that stood with them, and the expectation that he would

2    continue to be a warrior with them.

3         He reared beautiful children.  Beautiful children.

4    You've seen two of his sons in this courtroom before you

5    and have had some interaction with them.  He's got a

6    daughter and a son that are here today.  And I can assure

7    you they are equally as beautiful.

8         I listened as Myron -- Mr. Hill and Mr. Zeszotarski

9    spoke so passionately and emotionally on behalf of those

10   two young men, and it's those same qualities that endeared

11   them to their counsel that we have experienced with

12   Mr. Boyd.

13        Mr. Boyd, over time, became somebody that was

14   actually in direct conflict with what I would believe his

15   true character and nature are.  There are a lot of reasons

16   that that happened to him.  But there was a time -- and he

17   recalls it as being the happiest days of his life and his

18   family's life, a ten-year window when he had stepped away

19   from the Islamic religion.

20        He's not asking me to do this and he's not here

21   doing this.  We're not in any way trying to condemn the

22   religion, itself.  He will tell you that 95% of what he

23   had been exposed to in the Islamic religion was a

24   beautiful thing, and it was that beautiful thing that drew

25   him to the religion as a place to seek peace and serenity

and comfort, particularly in his times of stress and need,
which have been a great many number of times in his life.

But he says you've got this 95%, and then there's a
5% place where the extremists work that brings the bad,
that brings the dark and brings the oppressive.  And he
got to a place where he couldn't distinguish how do you
keep the good and not get the bad.  And the more he -- he
tried to make peace with those two places in that theology
when stress is place on him.

He would leave the religion, and then something
would happen and he would come back.  And he was held up
in great regard do to his courage in going to fight as a
young man in this, and this Saifullah persona was a place
that he could go to when he felt inadequate, when he felt
like his life was failing.

It was a psychological and emotional vulnerability
he had, largely due to the way he was raised and the
experiences and the hardships he had.

And, ultimately, when he came back into the religion
again and got so overwhelmed and consumed with the
extremism, it had been after a series of very -- very
difficult things.  He had almost died from hepatitis-C.
He had been taking very serious drugs that his family had
told you in their letters were changing the way he acted
and thought and behaved.  And, at the same time he had,

right on the heels of that, this experience with his

father.  And then, of course, we know about the loss of

his son.

I thought, when I heard the lawyers talking about a

friend who had written a letter on behalf of the sons,

noting a change in their appearance after they left school

and had come home, and, you know, Daniel was pressing

everyone into this very rigid, extreme place.  Daniel's

clothing had become that way.  Daniel's appearance had

become that way.

Over the years, you could see, because of the -- of

the consistency of the surveillance -- you could see the

decline in this man.  And he didn't understand what was

happening to him.  His family didn't understand what was

happening to him.  And when he reached out to the people

in the Islamic community that he would go to, they were

not steering him away from -- from what he believed --

from what he was coming to believe.

He sees the FBI's arrest of him as an intervention.

He believes that but for their timely arrest of him he

could have, and would have, perhaps, destroyed his whole

family.

I can tell you, in working with him and going back

through this audio, it's just been an extraordinarily

painful and humiliating experience for him, and he could

1    only take it in small pieces.

2         When Drs. Hilkey and Corvin showed up to see him, he

3    very desperately wanted to understand how he could get

4    himself into such a frame of mind to say and do and behave

5    in the way that he had, and it was like watching a man

6    gasping for air while he's drowning.  He was hungry for

7    understanding.  He needed understanding.  And it was

8    painful.

9         I've heard about how people develop psychological

10   defenses against the pain they're feeling in their lives.

11   I'm sure we all do that at various places on the spectrum.

12   But Mr. Boyd had done that in such an almost impenetrable

13   way with this persona and adopting a different manner of

14   speaking, and keeping people around him, and delving

15   deeper and deeper and deeper into another -- another place

16   in life and in time and in the world, and to watch him

17   work through that has been a remarkable experience.

18        And it is very much like peeling a layer, you know,

19   off of an onion every day, every day, every day, little by

20   little by little, until finally we begin to see the Daniel

21   that we have here in this courtroom.

22        He's made a -- just a -- I've never seen anyone in

23   my career as an attorney -- and I've been reflecting on

24   outside of just my career focus -- but I don't know that

25   I've seen anyone work so very hard to find their way back

1   into a true and clear way of thinking.

2          He has searched his soul spiritually.  He has worked

3   hard legally in his cooperation efforts and in trying to

4   understand where he's at, and working as a witness in the

5   case, and working with his sons.  That helped him come to

6   the right place.  And the work he's done emotionally and

7   psychologically has just been extraordinary.

8          And I would ask the Court to consider those things

9   in a departure.  I do think he was uniquely vulnerable to

10  this experience, and, to his credit, has worked hard to

11  understand how that happened, and he worked towards

12  repairing the psychological damage in building up a better

13  understanding of how that happened to him so as not to

14  have that vulnerability again in the future.

15         The doctors will tell you that the progress that

16  he's made psychological in are, in effect, similar to

17  burning a bridge in that he's not likely to go backwards

18  from where he is now, but only forward.

19         Mr. Boyd would tell you that he can see he's got

20  further to go, but it's not nearly as far as he's been to

21  get to this place.

22         I would like the Court to give him a substantial and

23  meaningful departure from the guideline range, and, based

24  partly on the mental health vulnerabilities, partly

25  because of the strong, good father he had been before the

```
 1    extremism had consumed him and led him, and, ultimately,
 2    he led his family astray.  And I think the fact that he's
 3    got a good prognosis, I think, is important, as well.
 4         Certainly, the government will make a recommendation
 5    based on his cooperation; but I would like the Court to
 6    give strong consideration to these factors, as well.
 7              THE COURT:  This is under 5H1.3, a departure
 8    based on mental health and emotional vulnerability?
 9              MS. GODWIN:  Yes, ma'am.
10              THE COURT:  All right.  And then considering
11    aspects of your argument that don't squarely fit into that
12    category, as a motion for a variance under 3553?
13              MS. GODWIN:  That's correct, your Honor.
14              THE COURT:  Okay.  Well, let's -- as far as a
15    basis for departure under the sentencing guidelines, is
16    that the extent of your argument revolving around 5H1.3?
17              MS. GODWIN:  Yes, your Honor.
18              THE COURT:  Okay.  As to that aspect of the
19    defendant's argument, what says the government?
20              MR. BOWLER:  We really don't oppose it, your
21    Honor.  We think that whatever the reduction ought to be
22    ought to be incorporated within our motion for substantial
23    assistance.
24              THE COURT:  Well, I don't allow it under 5H1.3.
25    I don't find the vulnerabilities that have been described
```

1    so exceptional as to warrant a departure.  So, that would

2    be the first step in determining the advice of the

3    guidelines; though I certainly will reflect on it again,

4    his parenting and other aspects under 3553.  But I think

5    that's where we are.

6         But maybe you want to make your motion now before I

7    go to 3553 for a departure under the guidelines?

8              MR. BOWLER:  Yes.  We thought it most efficient

9    for us to make a single presentation to the Court as to

10   our position, including the motion for substantial

11   assistance and our ultimate recommendation for a sentence.

12   But if the Court wants us to bifurcate it --

13             THE COURT:  No.  That would be efficient.

14             MR. BOWLER:  Okay.  I think it's been -- coming

15   to this point and analyzing what to recommend to the Court

16   and how to describe how we see this defendant's standing

17   in the court's been one of the more difficult, complicated

18   and gut-wrenching experiences any of us have had in a

19   sentencing phase, your Honor.  I think very few people

20   make it back from where Mr. Boyd had gone mentally,

21   emotionally, spiritually and in terms of cooperation to

22   that extent.

23        My own role in the proceeding, I think, requires me

24   to review first the aggravating factors that are

25   undeniably there and that brought us to this position.

THE COURT:  Well, I -- in speaking about the offense conduct, with which I am familiar, the heinousness of Mr. Boyd's actions are extraordinary.  I've heard a lot about the family, but I remember Jude Mohammad's mother's testimony in the first trial, and her searing pain, as she learned her son had been launched to Pakistan by Mr. Boyd.  And that resonates in this room today, although she's not here to speak.

I think about the families of the defendants that I've sentenced and the avenues that were opened for these men by Mr. Boyd, and the great damage that was wrought.

None of us know the consequences of his actions fully when he was in Jordan and who really was on the phone when he was summoned to speak to a cleric, or was he speaking to and what did they do with the information that Mr. Boyd provided.

And I think none of us who listened to the news kept moving when we heard that Jude Mohammad was one of the three people supposedly on his way back into America on the 10th anniversary of 9/11 to commit these crimes again.  That seems to be nothing more than rumor.  But that was in the news.

So, obviously, methods of security and monitoring have been changed.  No doubt, the government has spent an untold amount of money in this case.  And it all gets back

1  to the actions of Mr. Boyd.

2       So, this case is so very difficult to balance that

3  extraordinary depravity and horror that he inflicted

4  against a man coming full circle, whose sons have been

5  treated by the Court in recognition of what the father

6  did, and received, as you may recall, sentences less than

7  what the government advocated at sentencing.

8       But I've reflected on the horror that that man had

9  worked in his family to these impressionable children

10 growing up, and what he did to them and the lives that

11 they were leading that he took away.

12      So, yes, yes, it is a difficult case and a heartfelt

13 case on both sides; but I think it's very appropriate to

14 start with the aggravating factors, and then we'll see

15 where we go.

16           MR. BOWLER:  The government agrees with each

17 and every thing the Court has said, your Honor.  And we're

18 well aware of it, and we were aware coming into this.  We

19 believe that the Court's perceptions and reactions were as

20 you've described for good reason.

21      The defendant formed the hub of the conspiracy.  I

22 used that in one of the opening statements.  Background is

23 a little bit -- I was not involved in this case at its

24 outset, and was inserted in it, and came to understand

25 what that meant better and better as time went by.

 1          The FBI team that put this case together, along with

 2     related agencies, was fantastic and patient with me in

 3     bringing me fully up to speed, and I appreciate that.  My

 4     cocounsel has been outstanding.

 5          He was the center of the focus.  He's clearly

 6     bringing -- attracting these young men.  He's spreading

 7     propaganda.  He's ginning them up.  He sends his own son

 8     out to get Jude Mohammad to the airport to make sure he

 9     doesn't not take his trip out there, which reportedly has

10     ended in his death.  We are aware of all of that.

11          Those trips to the Middle East were not innocuous.

12     They had some innocuous purposes behind them, also; but

13     they occurred in the context of a continuous feeling out

14     of how do we make contacts and arrange for possible

15     involvement with mujahidin in some different theaters.

16     It's the picture of global jihadism, as Mr. Kohlmann

17     described it much better than I could.  And Mr. Boyd was

18     actively caught up in that.

19          Mr. Boyd brought his sons into that.  Those two

20     young men, I don't -- the government does not believe

21     would ever have been involved in anything like this had

22     not -- had he not led them into that.

23          He encouraged other young men to go and fight.

24          As the picture evolved and as I became more and more

25     familiar with the details in the case -- albeit true that

he was definitely the hub of the wheel in the old analogy

as to conspiracy law -- to some extent, my perceptions of

that changed a little bit as he was more of a

communications hub in that these individual -- he didn't

take raw recruits and turn them into radical jihadists.

He became caught up in what is barbarism, in the

government's opinion -- pure evil, which is this sliver of

evil which is radical jihadism -- but he didn't invent

it.  And, unfortunately, there are many others across the

globe, and, unfortunately, others within the United States

that have been caught up in.

He's not Subasic.  He's didn't get involved with it

because he's constitutionally enthralled with killing and

maiming and abusing people.  He came to it out of

emotional instability and where -- its role in Islamic

theology.

It's hard -- I think it's important, as we go

through this, to distinguish him from the display the

Court just heard in Subasic's multi-hour sentencing in

which he denied he fought, and accused --

THE COURT:  You know, there are a lot of

similarities, too.  Narcissism.  And the broken families.

I mean, it's -- there are differences, but there are

similarities.  I welcome you distinguishing how you think

this case is different.

1          MR. BOWLER:  There are some similarities.

2    There is -- especially when we first began working with

3    him, we noted the similarities with some -- with --

4    clearly.  But there are radical differences.

5          THE COURT:  He really believed -- he wanted to

6    die on the battlefield.  That was the way to get to

7    heaven.  Subasic didn't want to die on the battlefield.

8    He just wanted --

9          MR. BOWLER:  Subasic wanted to kill on the

10   battlefield.

11         THE COURT:  Uh-huh.

12         MR. BOWLER:  Boyd went off at 19, with two

13   babies and a young wife, and made himself available to the

14   cause.  He's since exaggerated of his battlefield

15   experiences, but he generally went out there, and my

16   understanding is saw dead bodies, got close enough to

17   artillery fields and mortar fields, that he was hiding

18   behind rocks, and also worked a lot with the refugees that

19   were over there.  But the phenomenon of a 19-year-old

20   fellow with two babies and a wife going off to Pakistan,

21   he wasn't getting paid for that, he didn't do it out of

22   some sense of attraction to something approaching sadism,

23   like Subasic.  He did it because he thought at the time it

24   was the morally right thing to do in his world.

25         But, yes, the evil he became involved with is the

same for both Subasic and he. The motivation is radically different and the capacity, I think, to reform is radically different between Subasic and Boyd.

There are other points we haven't mentioned. Mr. Boyd's -- he's the one who accumulated the pile of weaponry. His planning and discussion included go -- shoot for the head against the FBI team, which I just -- which have brought this -- to capture this evil, and stopped it, and brought this case before the Court, and treated Mr. Boyd with great fairness and dignity as the process is going on.

THE COURT: Well, you're highlighting the very extensive nature of this defendant's offense conduct, and you can talk about stockpiling the weapons, the training in Caswell County. There are so many things you can talk about.

MR. BOWLER: Particularly poignant is the Barnes & Noble incident, in my own mind. Is that he brought his two sons armed with the implication, if not the expressed instruction, that we were not going to go -- that they were not going to go down without a fight, which means his two boys getting shot and killing FBI agents, if they were successful. So, that was -- that's a frightening thing.

And I think Mr. -- Mr. Boyd made -- put all these

1  elements together, the propaganda, the weaponry, the

2  exhortation to go forth, and it being this obligation of

3  all Muslim men to wage jihad, and Mr. Boyd was -- became

4  imbued also with the sense that if he couldn't get

5  overseas, it was going to take place right here.  And the

6  Court's heard that evidence also.  We have to bear all

7  that in mind, and the government does, too, in its role in

8  this.

9        The flip side is these trials would -- if we had not

10  had the cooperation of the three Boyds, would have been

11  longer, more difficult, and the outcomes less certain.

12        Those -- that sea of tapes, which -- recordings that

13  took place, they worked hours on.  It greatly streamlined

14  our process of presenting that evidence and making sense

15  of it, too, to the jury, to have them, the participants in

16  it, say I've reviewed this, I was present, this is what we

17  were talking about, this is what we meant.

18        We have met for approximately -- I've lost track,

19  but approximately 15 times with Daniel.  Every time it's

20  been for hours, frequently it's been nearly for a full

21  day, over and over.  It has been an intense process.

22        It started slowly.  He was defensive.  He was -- he

23  parsed things.  Clearly, what was happening in the tapes,

24  given the context of evidence, was clear, and he would

25  parse it.  Well, yes, I knew we were going overseas, but

it wasn't in -- it was mostly tourism stuff.  We'd have to
bring him back.  Daniel, this was happening in the context
of you're saying this and spreading this propaganda and
having this meaning, et cetera.  And he would come back
around.  Yes, you're right.  It was also for the purpose
of seeking out contacts to enable us to wage jihad over
there if we chose to do so.  It was a painstaking, slow
process.

It was obvious -- him listening to his own voice and
that sometimes of his sons in his presence on the
recordings was bitterly painful to him and to the point he
was reduced to tears.  Not that he had been captured, but
it was genuinely at what he had done, it was our
perception.

He -- it was a long process and which began with
Ms. Godwin and Ms. Graves long before we became involved,
months before, but of him confronting what he had become
and the evil of it.

If not for his plea, he -- well, we arranged also,
at his request, could I meet with my sons after he was
incarcerated and after he had decided to accept the plea
offer that was made to him.  And we arranged that.

He was instrumental, we believe, in convincing his
sons, and essentially giving them permission to cooperate,
to enter their own pleas.  And he did that knowing that it

1   was going to damage him to some extent.  And that played

2   out more later on.  But, we believe if he had not

3   encouraged them and counseled them and pushed them to go

4   ahead and let down their defenses, enter into guilty pleas

5   and cooperate, it would not have happened.

6        If he had stood fast, there's a big danger they

7   would have, too.  We can't no that for certain, but he was

8   certainly very influential in getting them to cooperate.

9   So, he led his sons into this mess and he also took the

10  courage -- had the courage eventually to lead them, to

11  show them the way out to minimize the damage that was

12  being done to them and to help the system deal with the

13  aftermath of everything he had.

14       His participation in the first trial, the Court -- I

15  just wanted to review a few points that I perceived -- I

16  understand the Court was there and has its own

17  perceptions, probably more piercing than my own.  His

18  cooperation in that trial helped the government.  There's

19  no doubt.  All those tapes, the authentication.  We would

20  have had, as I started to say before, gone through a

21  lengthy process of establishing the recording gear, the

22  accuracy, the times it's checked, all to establish that it

23  was functioning, that it had never been changed, and

24  whatnot, and we could shortcut that when we could have a

25  participant say, I've listened to this.  It's accurate.

1    That's what I said.  And that's what he said, that's what

2    I heard.

3         But he was very good on that.  He was more halting

4    and still parsing somewhat and vulnerable to cross-

5    examination that was essentially misleading, from the

6    government's perspective.  I mean the cross was.  And he

7    fell into some of that.

8         And if the Court will recall, I went after him

9    pretty aggressively in redirect after that, and rubbed his

10   face in the recordings about Quantico.  And -- but how

11   that first trial ended as to his testimony stuck in my

12   mind to this day.  He gets crossed, and -- and I think it

13   was Mr. Ayers, whose a very good trial lawyer and a fine

14   individual, but he overreached a little bit on that, and

15   asked him some question about were you ever going to do

16   any of these things you talked about, was the thrust of

17   the question.  And Daniel answered, I have had two years

18   in a cement cell to think about that, and I'm terrified of

19   what I might have done if they, meaning the FBI, had not

20   stopped me.

21        That was remarkable.  It was a contribution to our

22   case, but it was also a remarkable expression of honesty,

23   I think.

24        By the second trial, his process of him confronting

25   who he had become and what he had done was much further

1  along.  He had made peace that he had become involved with
2  evil.  He wasn't parsing.  He wasn't -- he felt like -- he
3  seemed to feel no -- less conflict between his loyalty to
4  Islam and that messy -- that radical version of it and
5  what his role now was to cooperate.
6      And, from the government's perspective, he was
7  devastatingly effective against Mr. Subasic.  We had
8  instructed him to show respect to Mr. Subasic no matter
9  how disrespectful he's likely to be to you.  And, from the
10  government's perspective, his performance was remarkable.
11      I remember numerous occasions in which he says to
12  Subasic -- Subasic would have some abusive, almost
13  unintelligible, question of him, and he would say, are you
14  trying to ask me this.  Yes.  Yeah, that's what I'm
15  asking.  And then it would come back, well, what was
16  happening at that time was X, Y and Z.
17      Our own perception was largely, when Daniel starts
18  out in our interviews, he was minimizing, he was taking
19  things in isolation and parsing.  By the time we were
20  finished, he was straightforward and cooperative as to the
21  best of his ability.  And he spent hours reviewing those
22  recordings and finding corrections to us.  But, from our
23  perception also, he tried to be scrupulous about not
24  saying, well, look, I think you're wrong.  I see why
25  you're -- you think that's what we were talking about on

these tapes, but this was more harmless.  This is not
really -- whichever the other codefendant we might be
referring to at the time, that's not what the thrust of
this conversation was.  It was more really about this.
Was there overtones of that?  Maybe.  But the heart of it
was about something else.  And we would drop it, or move
on, or we'd have a better perspective on it and not
present it as -- on the point we thought it was pertinent
on.

      He really had scrupulous sense of telling the whole
truth, but not just saying anything we wanted.  That was
our perception.

      We have -- unfortunately, we doubt this is the last
case of this sort, probably before this Court and
certainly before other courts within the country.  And to
have someone so deeply embedded that's come so far, we
have a big institutional interest in having them reap some
benefit from that.

      The government needs to defend -- needs to be and
needs to be perceived as a fierce opponent if you fight it
and try to lie and dissemble and cover up serious criminal
conduct.  But we also want to be seen as an effective ally
if you can admit your own faults, your own conduct, and
fully cooperate.  Because we have to -- to effectively
fight this fight, we need people from inside these

1    circles, and they're difficult to get.

2         We want -- these cases and the results of the

3    sentencing on all the different cases make their circles

4    through the defense bar and through, I believe, the bad

5    guys' awareness to a remarkable extent.  It's all these

6    things that we think need to be balanced.

7         The conduct was horrific.  I think it could --

8    clearly, it could have, at various points in time,

9    exploded into true violence, leaving dead on both sides,

10   and maiming, and horrific scenes.  Thank God, it didn't.

11   Also the transformation, we believe, is sincere.  We don't

12   believe he's a future threat.

13        Subasic -- we think his transformation, that

14   description that he now believes this is a corrupted

15   ideology, is sincere.  We compliment the defense counsel

16   on another point.  They made available to the government,

17   the psychiatrists.  And we had a session with them, both

18   Mr. Kellhofer and myself yesterday, of some length.  And

19   we were struck by how we really didn't have points of

20   contention.  Our perceptions of his sincerity on other

21   points, his character flaws that got him into this mess in

22   the first place, this devolution which took place in his

23   personal life which constituted something of a perfect

24   storm, all our perceptions were about the same.  We're

25   really not, in terms of the factual presentation to the

```
1    Court, adverse to the defense at this stage.

2         But -- and we do -- we can't diminish the

3    egregiousness of the conduct, and we don't regret

4    prosecuting Mr. Boyd.  He needed to be charged.  He needed

5    to be prosecuted.  This needed to be stopped before it

6    became something -- became a violent outburst.

7         He had a role in Jude Mohammad going overseas and

8    very possibly being dead today because of it.  There are

9    some references on the tapes to others that were involved.

10   We don't really know too much about them or if that was

11   puffery at the time.

12              THE COURT:  You haven't figured that out?

13              MR. BOWLER:  These other names I don't think

14   Mr. Boyd remembers.  We'd listed a bunch of names, and we

15   don't have final -- I don't think we'll ever know, and I

16   think he'll tell us if he knows.  But some of that was

17   puffery, I think, and he did exaggerate his role overseas

18   and his role otherwise, and this belief in the magical

19   events that happened overseas was essentially just bold

20   talk, your Honor.  Exaggeration, some of it, we think.

21        We have given a lot of thought to all of this.  Our

22   recommendation to the Court, if the Court is willing to

23   hear it, would be that he be sentenced to approximately 18

24   years in prison.

25              THE COURT:  Okay.  Well, there's sufficient
```

1   basis on the record.  Without wanting to short-circuit the

2   defendant's presentation, certainly, please present

3   anything that would be helpful in understanding the scope

4   of your client's helpfulness.  But based on what I've

5   heard from the government and what I've observed, there is

6   basis to allow the motion, and I do.

7        What else would you like to say in furtherance of a

8   sentence that's sufficient, but not greater than

9   necessary.  And then, Mr. Boyd, I'll certainly give you

10  the chance to speak.

11       MS. GODWIN:  I have one thing I would like to

12  comment about.  The young men that came -- and I think the

13  government agrees with this -- that they came to Mr. Boyd

14  because they shared those beliefs, not because he sought

15  them out to radicalize them.  I do think that's important.

16       He did have a role with Jude, but he was not the

17  only one.  There were other individuals influencing Jude

18  that were unrelated to Mr. Boyd.

19       And Mr. Bowler makes a very good point.  Mr. Boyd

20  did not invent extremism.  He did not go and search in

21  life for an extremist view that would bring him to this

22  place in life.  He did not intend, as he was growing and

23  developing this beautiful family, to destroy them.  That

24  had not been his goal.  And I do believe that extremism

25  does prey on the vulnerable.  And Mr. Boyd was, in fact,

1    vulnerable.  And he has suffered and will pay a price for

2    that.  But he has suffered a great deal, as well as those

3    that he has impacted by the spreading of the extremism

4    during this time period.

5         And I would like the Court to understand that, in

6    some ways, Mr. Boyd had allowed himself to become

7    victimized before he was victimizing other people.  He was

8    becoming more and more oppressed himself about what he

9    believed the religion demanded of him, and, in turn, found

10   it a duty to press that down into his family and to other

11   people.  But he was feeling that same dark oppression that

12   you speak about when you observe his actions with other

13   people.  I mean, it was coming into his head, and he was

14   feeling that same oppression.

15        He was burning his guitar because music was not

16   allowed in the religion.  He was canceling his health

17   insurance because health insurance was not allowed in his

18   religion.  There were things that he was depriving himself

19   of because he believed at that time in his life that

20   that's what was expected of him as a good Muslim.  And

21   he's destroyed, you know, what he had, as well as the

22   damage he's caused other people.

23        And when the time came, Mr. Boyd did find himself,

24   and he did the honorable thing, I think.  And, as he's

25   told us, he knows he let America down; but he is so

1    grateful that America did not let him down.

2           THE COURT:  Thank you.

3       Mr. Boyd?

4           THE DEFENDANT:  Can you hear me?

5           THE COURT:  Uh-huh.

6           THE DEFENDANT:  I would like to make that

7    point, actually --

8           THE COURT:  Now I am having a little trouble

9    hearing you.

10           THE DEFENDANT:  It's my fault.  I'm sorry.

11      I would like to have made that point specifically

12    about -- I've had three years now.  A lot of it's been in

13    isolation.  I'm not complaining about that.  It's been

14    tremendously beneficial, actually.  I've never had time

15    like that in my life.  And I agree with all they've said

16    about I didn't invent this way and it's not some way I

17    went out and sought.  It is a way that is very subtly

18    spread and it's not some little tiny radical group that

19    does it.  So, I did fall victim to that.

20      I am very sorry for falling victim to that.  I don't

21    mean like sorry that I went after it.  I'm sorry that I

22    let down that -- that whole -- the whole American spirit.

23      Look, I was raised by people that have always put

24    down America, always put down the system.  They were just

25    anti -- almost everything.  Anti-establishment.  And I

used to hide in my heart how much that used to hurt me.

And this still took place all the way up to the arrest. I'm battling that inside me. It's not -- it's not some defense. It's just a fact. And it's rampant in my family, and it was rampant in the people I was involved with. And I let that overtake me.

And that's why I'm very sorry to everyone; not just you. When I say I'm sorry to you, I mean I'm sorry to you as my American countrywoman and all of you all as my American men and countrywomen. That I dropped the ball on my responsibility as an American, as a human being. I know that. I know that. I live with it every moment.

But it is also that very American spirit that is alive in me that pushed me to do what is correct and to do what is honorable about this. And that has to stand for the reality that it represents. It's our essence of what we stand for. The very honor and integrity that we stand for. It's what is fixing me.

And you have my vow, and let the world hear it, that nobody will ever put that down in my presence again. I can't put it any clearer than that.

The sorry I feel, I don't have words for you. I'm sorry, I don't know how to express it. It's so deep. It's just so moving and deep.

I'm shamed beyond words. And I agree with a lot of

what you had to say.  I think there are some things that
have been misunderstood, but it doesn't take away from
what you've described as the heinousness of it.  And I'm
not here to argue over it.  I accept that.  I do.  And I
accept that with that American spirit.

I hold no malice.  I hold no -- anybody here or
anybody, really.  I hold no harm for anyone.  I take
responsibility.  I know you have to punish me.  I except
that.  I just hope you really know that that was not me.
That was something they I have allowed myself to be
become.  Therefore, I'm responsible for it.  I respect
that.

I do see what I have done to my sons and my family
and others who came around me.  I've never denied this.
I've just understood it differently as this has gone
along.

And every single person -- my counsel, Mr. Bowler,
Mr. Kellhofer, FBI, the marshals, yourself -- everyone has
helped me get back, if you will.  And I know I still have
some ways to go.  I'll never forget that.  That is, I
think, the greatest victory in this.

No matter how much time you give, no matter how much
pain came, I can't tell you the pain I feel for Jude
Mohammad's mother or my codefendants.  But what can I do
about that except try to right any of the wrongs from

1    here -- from this point forward.

2        I know there's never a wrong time to do the right

3    thing, and that's the course I've been trying to stick to.

4    But it's not been so clear.  It's not -- the way you're

5    speaking about it now is with a very clear mind.  And the

6    way everybody understands and the way the FBI had decided

7    to follow me was because they had clear minds listening to

8    it.  My mind was not clear.  And it's still not all the

9    way.  I'm getting there.  But, as I get there, I see very

10   clearly that yes, it was the right thing.

11       When I told the FBI, after they arrested me, you

12   saved me, one of them -- he knows who he is -- and he very

13   lovingly told me no, God saved you.  But the instrument

14   that I used was our very system and the brotherliness,

15   and, you know, fellow Americanness.  It's saving this

16   situation right now.

17       And I just -- I want that known out there that I see

18   that and respect that.  And I am one of its champions, or

19   training to be one of its champions, forever.  I'm not all

20   the way there.

21       And I do -- I do thank you for all the mercy and

22   compassion you can show.  And I know you will.  I know

23   you'll do whatever you feel is right.  And I accept that.

24   And I can understand that as being your position.

25       I just hope you know that I cannot hurt someone

1  knowingly, and I would never.  But I let myself lose

2  touch, and that's how I hurt other people; is that I went

3  out there being something that is incorrect.  My family

4  knows it and everyone knows it.  And I openly accept it.

5       And I wish I could get all that hurt back, but I

6  can't except trying to right it from this point forward.

7  And I'm committed to that.

8       Please, everyone, as best as you can, forgive me.

9  Just pray for me.  I'm doing the best I can.

10       Thank you.

11            THE COURT:  Have I heard the defendant's

12  counsel fully as to the sentence?

13            MS. GRAVES:  Yes, your Honor.

14            THE COURT:  Okay.

15            MS. GODWIN:  Your Honor, I would make one

16  comment regarding the sentence.

17       Just before the proceedings, Mr. Bowler, for the

18  first time, told us what his recommendation to the Court

19  would be.  And Ms. Graves and I both thought it was

20  very -- very interesting.  I had anticipated asking the

21  Court for a sentence of 180 months on Mr. Boyd's behalf,

22  and I was struck by how close that was to Mr. Bowler's

23  recommendation of 18 years.

24       And I think it's a reflection of Mr. Bowler's

25  comment, just in talking with not only Mr. Boyd over this

time, but also with Drs. Hilkey and Corvin, and all the

conversations we've had that somewhere along the line

Mr. Boyd and the government have gotten very close to

seeing this situation in a very similar and compatible

manner. And it's because they've spent so much time

together.

Mr. Boyd has come to a place of understanding his

culpability and his vulnerability, and the government has

come to know Mr. Boyd in his efforts to rehabilitate

himself spiritually, morally, and mentally. And I would

ask the Court to consider that in fashioning your

judgment.

THE COURT: Well, I've considered the advice of

the guidelines specifically and generally in this case,

and the factors set forth in 18 United States Code,

Section 3553.

It would appear that the need to protect the public

from this defendant has been largely mitigated, though

it's recognized the defendant needs continued mental

health treatment by his own statements here today.

He's enjoyed an extraordinary amount of support from

the government that he's very capably spoken of. Numerous

meetings with counsel; numerous meetings with agents and

attorneys. And the support that that's provided to you

is, in large part, going to ameliorate itself as you move

into the Federal Bureau of Prisons.  Whatever opportunity
that you get in that system to continue your mental health
treatment you should take advantage of.

The need to promote respect for the law, the need to
discourage this type of conduct, the need for the sentence
to reflect the seriousness of the offenses at issue, the
Court pauses on these factors.

Having considered all of the factors set forth in 18
United States Code, Section 3553, pursuant to the
Sentencing Reform Act of 1984, the Court imposes a
sentence of 180 months on Count 1 and a term of 216 months
on Count 2, to be served concurrently, to produce a total
term of incarceration of 18 years.

Pursuant to the plea agreement, Counts 3 through 11
are now dismissed.

When you get out of prison, Mr. Boyd, you're going
to be supervised for five years.  That's three years on
Count 1 and five years on Count 2, to run together.

If you break any law, federal, state or local,
possess a weapon or drugs illegally, you'll be in
violation of the Court's judgment.

There are some other standard conditions you'll have
to abide by and some special ones.

I am going to recommend you for continued mental
health treatment under the direction of the Probation

1   Office.  You'll have to participate in a program approved

2   by it for the treatment of addiction or dependency.

3   You'll consent to warrantless searches and cooperate in

4   the collection of DNA.  There's a $200 special assessment,

5   which is due immediately.  Restitution is not an issue.

6       The Court's reflected on the circumstances and finds

7   a fine is appropriate, but that you can't pay a fine

8   within the guideline range, and imposes a fine in this

9   case of $3,000.  The fine is due immediately.

10      Before I explain to Mr. Boyd how he can appeal, does

11  the Probation Office have any changes recommended?

12          PROBATION OFFICER WASCO:  No, your Honor.

13  Thank you.

14          THE COURT:  All right.  Thank you.

15      Does the government have any changes recommended?

16          MR. BOWLER:  No.  Thank you for hearing us,

17  your Honor.

18          THE COURT:  And does the defendant?

19          MS. GODWIN:  Your Honor, I'm not sure if I

20  heard this.  Did you make a recommendation for drug

21  treatment?

22          THE COURT:  I made a recommendation that you

23  participate in a program approved by the probation office

24  for the treatment of addiction or dependency, which would

25  include urinalysis testing.

```
 1          MS. GODWIN:  I would like that he be
 2   recommended for drug treatment within the BOP.  He has a
 3   history of drug use that only ended as he became more
 4   extreme in '04 and '05.
 5        And, if the Court could make a recommendation that
 6   he be housed close to North Carolina or within North
 7   Carolina?
 8          THE COURT:  I will certainly recommend Butner
 9   or as close to North Carolina as possible.
10          MS. GODWIN:  Thank you.
11          THE COURT:  He has a dependent personality in
12   some respects.  Are you thinking that some part of the
13   most intensive substance-abuse treatment program would be
14   helpful in a variety of ways to your client?
15          MS. GODWIN:  I do, your Honor.
16          THE COURT:  All right.  I'll recommend that.
17          MS. GODWIN:  Thank you.
18          THE COURT:  Now, you can appeal, Mr. Boyd, if
19   you believe there's something very wrong with your
20   conviction or with this sentence.  But you need to move
21   quickly.  And you have given up a number of your appeal
22   rights.  And these waivers have been generally held
23   enforceable.  If you believe they're not, you can present
24   your theory to the Court above, with very few exceptions,
25   as noted.  You've got to move quickly.  You've got 14 days
```

1   from the date the judgment goes on the docket.

2          If you cannot afford the cost of an appeal, you can

3   apply for permission to appeal for free.  And, if you

4   request, the Clerk will prepare and file the appeal

5   paperwork.

6          Does your client have any questions about the

7   judgment or about his appeal rights?

8              THE DEFENDANT:  No, ma'am.

9              THE COURT:  All right.  You'll get credit for

10  time served.  I'll put you back in the custody of the

11  Marshals Service.

12         Thank you.

13             MS. GRAVES:  Thank you, your Honor.

14             MS. GODWIN:  Thank you.

15         (Whereupon the proceedings concluded at 4:49 p.m.)

16                    *     *     *

17                    **CERTIFICATION**

18         I certify that the foregoing is a correct transcript

19  of the record of proceedings in the above-entitled matter

20  to the best of my skill and ability.

21

22  /s/ Harold M. Hagopian            November 23, 2014
    Official Court Reporter           Date

23

24

25